1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**

9                        **EASTERN DISTRICT OF CALIFORNIA**

10

11   SHAWN HAL SMITH,                    )   Case No.: 1:18-cv-0733 - JLT
                                         )
12              Plaintiff,               )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                         )   FAVOR OF DEFENDANT, ANDREW M. SAUL,
13      v.                               )   COMMISSIONER OF SOCIAL SECURITY, AND
                                         )   AGAINST PLAINTIFF SHAWN HAL SMITH
14   ANDREW M. SAUL[1],                  )
     Commissioner of Social Security,    )
15                                       )
                Defendant.               )
16   _____ )

17          Shawn Smith asserts he is entitled to a period of disability and disability insurance benefits

18   under Title II of the Social Security Act.  Plaintiff argues the administrative law judge erred in

19   evaluating the medical record and Plaintiff's age category.  Because the ALJ applied the proper legal

20   standards and substantial evidence supports the decision, the administrative decision is **AFFIRMED**.

21                                    <u>**BACKGROUND**</u>

22          On September 4, 2014, Plaintiff filed an application for benefits, in which he alleged disability

23   beginning June 4, 2013.  (Doc. 7-8 at 2)  The Social Security Administration denied his applications at

24   the initial level and upon reconsideration.  (*See generally* Doc. 7-4 at 2-16; Doc. 7-3 at 20)  Plaintiff

25   requested a hearing and testified before an ALJ on February 1, 2017.  (Doc. 7-3 at 20; Doc. 7-5 at 14)

26   The ALJ determined Plaintiff was not disabled and issued an order denying benefits on February 28,

27

28   _____
            [1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner.
     Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

                                                   1

2017.  (*Id.* at 20-32)  Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on March 27, 2018.  (*Id.* at 2-5)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

2

gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Medical Background and Evidence[2]**

Plaintiff ruptured his right Achilles tendon on September 22, 2011, while participating in beanbag toss at a work retreat. (Doc. 7-10 at 19; Doc 7-12 at 52) On September 30, Dr. Paul Mayo performed an "[o]pen repair of [the] ruptured Achilles tendon with graft jacket application." (Doc. 7-23 at 52) During the surgical procedure, Dr. Mayo "noted... a complete rupture of the Achilles tendon," with "almost an inch gap between the proximal and distal ends." (*Id.*)

Plaintiff had physical therapy following the procedure, and he was discharged from Dr. Mayo's care on March 22, 2012. (Doc. 7-10 at 60, 78) Plaintiff returned to work in May 2012. (*Id.* at 19)

In August 2012, Plaintiff returned to Dr. Mayo, reported he was "getting a lot of tingling and pain at the area where the Achilles tendon inserts." (Doc. 7-10 at 60) Plaintiff also stated he had "pain in his right knee and hip," from "compensating while he walks." (*Id.*) Dr. Mayo observed that Plaintiff had "some swelling and thickness" but believed he was "healing fine." (*Id.*) Dr. Mayo prescribed a Flector patch for inflammation and pain control, and "CryoDerm for topical pain relief." (*Id.*) He instructed Plaintiff to "do some physical therapy... at home every night in the evening" after being on his foot all day, for 10-12 hours at work. (*Id.*)

Plaintiff was fitted for a "custom molded, fully functional orthotic appliance[]" in September

---

[2] The Court has read and considered the entire medical record. This summary focuses upon the treatment notes and findings of physicians, as addressed in the ALJ's opinion and the briefing provided by both parties.

2012. (Doc. 7-10 at 59) He told Dr. Mayo that he still had "a lot of pain and fatigue in his right calf and Achilles area at the end of a long working day" but also reported "improvement since [his] last visit." (*Id.* at 59) Dr. Mayo found "[t]he previously symptomatic regions [were] non-tender to the touch or full weightbearing." (*Id.*) Plaintiff received the orthotics the following month and was directed to "gradually increase" the time he wore them, until he was able to do so full time. (*Id.* at 58)

In March 2013, Plaintiff returned to Dr. Mayo describing "extensive problems in his right lower extremity." (Doc. 7-10 at 56) Plaintiff said he had pain "down from his hip," and he got "burning, numbness, tingling on down his right lower extremity all the way into the foot and ankle," which worsened when sitting. (*Id.*) Dr. Mayo found Plaintiff had a positive straight leg test. (*Id.*) He believed Plaintiff was "getting some sciatic nerve issues," which he attributed to Plaintiff "walking different and compensating" following the Achilles tendon surgery. (*Id.*) Dr. Mayo ordered an MRI, which "was negative for any radiculopathy or bulging disks." (*Id.* at 55)

Plaintiff underwent an MRI of his lumbar spine without contrast on May 10, 2013. (Doc. 7-12 at 58) Dr. Michael Shin found "adequate alignment," "[n]o significant abnormal marrow signal changes," "no disk protrusion or extrusion," and "[n]o central canal stenosis." (*Id.*) Dr. Shin opined the results were unremarkable. (*Id.*)

On May 20, 2013, Plaintiff stated his pain was "directly in the center of his right buttocks." (Doc. 7-10 at 55) Dr. Mayo opined Plaintiff's "piriformis muscle [was] inflamed and he need[ed] chiropractic manipulation." (*Id.*) Dr. Mayo noted that if chiropractic care failed, Plaintiff would "have to consider injection therapy into this area or more physical therapy." (*Id.*)

Plaintiff visited the emergency department of Stanford Medical Center for right leg pain on June 3, 2013. (Doc. 7-10 at 7) Dr. Leroy Sims determined Plaintiff "may have sciatica, peripheral neuropathy, radiculopathy, piriformis syndrome." (*Id.*) Plaintiff received a trial of gabapentin and was discharged with directions to follow-up with his physician. (*Id.* at 9-10) A few days later, Plaintiff visited Dr. Mayo, and reported he had not yet taken gabapentin because "he wanted to find out with [Dr. Mayo] if that would be okay." (*Id.* at 54) Dr. Mayo prescribed Baclofen for Plaintiff's muscle spasms. (*Id.*) He determined he had "no other choice but to take [Plaintiff] out of work as his work [was] aggravating this [condition]." (*Id.*) Once Dr. Mayo received authorization on June 10, he

referred Plaintiff to chiropractic care, to occur twice a week for five weeks. (*Id.* at 54, 77)

On June 27, 2013, Dr. Mayo noted Plaintiff "had 6 of 12 chiropractic visits approved." (Doc. 7-10 at 53) Plaintiff reported Baclofen was helping, but he continued to have "a lot of discomfort" in his right leg. (*Id.*) Dr. Mayo believed Plaintiff's job was "too rigorous for him to do unless he [was] pain free." (*Id.*) Dr. Mayo opined Plaintiff would "be out of work at least a minimum of four more weeks, or until he [was] completely healed." (*Id.*)

Dr. Perminder Bhatia performed an initial consultation at the Neuro-Pain Medical Center on July 1, 2013. (Doc. 7-10 at 21) He opined Plaintiff did not appear "in any acute distress," and his "[m]emory and concentration ... [were] within normal limits." (*Id.*) Dr. Bhatia found Plaintiff's motor strength was 5/5, and his sensory exams were [n]ormal to pinprick, touch, and vibration [in] both lower extremities." (*Id.* at 22) Dr. Bhatia noted Plaintiff walked normally, without a limp, and had negative straight leg raise tests for the lumbar spine. (*Id.* at 22-23) However, Dr. Bhatia also found Plaintiff had "straight leg raising positive on the right side at 60 degrees," and it got "worse" when his foot was hyperextended. (*Id.* at 26) Dr. Bhatia determined Plaintiff had "tenderness in the right side lumbosacral area particularly [the] S1 joint area," and "tenderness on the right leg." (*Id.*) Dr. Bhatia diagnosed Plaintiff with "[r]ight side sacroiliitis by favoring his left leg and not using his right leg very well" and "[p]iriformis syndrome." (*Id.* at 27) Dr. Bhatia recommended Plaintiff receive a sacroiliac joint injection. (*Id.*) In addition, he noted that the symptoms associated with piriformis syndrome— which he explained was "sciatica but not originating from the spine but [instead] from the piriformis muscle—may be relieved by a Botox injection into the muscle. (*Id.* at 28) Dr. Bhatia noted Dr. Mayo indicated Plaintiff was "off work ... till July 28, 2013" and he would "keep that [date]." (*Id.*)

On July 24, 2013, Plaintiff received the recommended right-sided sacroiliac joint injection. (Doc. 7-10 at 31; Doc. 7-12 at 66) On July 25, Plaintiff visited Dr. Mayo, who observed that Plaintiff had "a very antalgic gait." (Doc. 7-10 at 52) In addition, Dr. Mayo noted that Plaintiff was "still getting a lot of spasms in his leg and his right calf [was] very weak." (*Id.*) Dr. Mayo opined Plaintiff was "doing very well" with his Achilles tendon, but he was not ready to work due to his pain. (*Id.*)

The following week, Plaintiff told Dr. Bhatia that he felt he was "about 30% better." (*Id.*) Dr. Bhatia again found Plaintiff's strength was 5/5 in all extremities and his sensory exam was "normal to

pinprick, vibration, and double sensory stimulation." (*Id.*) He determined Plaintiff had "decreased movement of the right side in the hip area with positive piriformis point." (*Id.*) Dr. Bhatia opined Plaintiff could "work with restrictions" including "half an hour alternating sitting or standing" and no lifting, bending, driving, or climbing. (*Id.*)

Plaintiff underwent an MRI on his right hip on August 20, 2013. (Doc. 7-10 at 38; Doc. 7-12 at 64) Dr. Tom Leskovar opined Plaintiff's "right hip space appear[ed] to be relatively well maintained with no fracture or significant bone marrow abnormality within the hip joint," and the "right piriformis muscle appear[ed] unremarkable and symmetric with that of the left piriformis muscle." (*Id.*) Dr. Leskovar determined there was "[n]o significant … abnormality of the right hip joint." (*Id.*)

In September 2013, Plaintiff returned to Dr. Bhatia and demonstrated "pain in the right hip area on touching and on pressure point and [the] lumbosacral area." (Doc. 7-10 at 33, 74) Dr. Bhatia found "no change in his exam." (*Id.*) He administered three "trigger point injection[s] to the right side lumbosacral area" and "1 injection into the right hip area." (*Id.*) Dr. Bhatia also prescribed naproxen for Plaintiff to take during the day and Neurontin to take at night. (*Id.*) At a follow-up later that month, Plaintiff reported the injections did not help. (*Id.* at 36) Dr. Bhatia continued to opine Plaintiff could work "light duty" with "no long sitting and standing," lifting, bending, or long driving. (*Id.* at 33, 36)

In October 2013, Plaintiff returned with his caseworker, to Dr. Mayo for a follow-up. (Doc. 7-10 at 51) Dr. Mayo informed the caseworker that Plaintiff should have a nerve conduction velocity (NCV) test and electromyography (EMG). (*Id.*) Dr. Mayo indicated he was "getting aggressive in a different [treatment] direction" and would send Plaintiff to Dr. Brandon Sorenson, a chronic pain specialist, "to consider a spinal cord stimulator." (*Id.*)

Dr. Sorenson evaluated Plaintiff on November 18, 2013. (Doc. 7-10 at 63) He found Plaintiff had a "mildly reduced" range of motion in the lumbar spine and negative straight leg raise tests. (*Id.* at 66) Dr. Sorenson determined Plaintiff had a restricted range of motion in the right leg, his strength was "4/5 throughout" the lower right extremity; his range of motion and strength were normal with the left leg. (*Id.*) Dr. Sorenson also noted Plaintiff walked with an antalgic gait. (*Id.*) Dr. Sorenson noted the "NCV/EMG ... caused [Plaintiff] to have spasms," and Plaintiff described "worsening pain" when his muscles were tested during the EMG. (*Id.*) Dr. Sorenson noted Plaintiff's results from an MRI of his

right hip, MRI of his back, and EMG were "normal." (*Id.* at 64) In addition, Dr. Desmuku opined Plaintiff had a normal NCV. (*Id.* at 50) Dr. Sorenson concluded he was "unable to offer [Plaintiff] either a procedure or medication that [would] help his pain." (*Id.* at 63)

In December 2013, Plaintiff sought a second opinion with Dr. Frank Cantrell with an NCV and EMG. (*See* Doc. 7-10 at 50, 61-62) Dr. Cantrell determined Plaintiff had a "[n]ormal EMG of the right lower extremity." (*Id.* at 61) With the NCV, Dr. Cantrell determined it was a "[m]inimally abnormal nerve conduction velocity study of the right lower limb due to the minimal prolongation." (*Id.*) Dr. Cantrell determined there was "the possibility of a mild right tibial nerve palsy at the level of the ankle." (*Id.* at 62)

In January 2014, Dr. Mayo noted Plaintiff's prescriptions included naproxen, tramadol, and nortriptyline; and Plaintiff was doing "some physical therapy for his hip problem." (Doc. 7-10 at 59) Dr. Mayo indicated Plaintiff would be off work until April 20, 2014, and "Dr. Cantrell [would] reassess him prior to that to decide if he need[ed] to be off any longer." (*Id.*) Later that month, Dr. Cantrell examined Plaintiff and noted he "walk[ed] with a very definite right-sided limp." (*Id.* at 93) He found Plaintiff's straight leg raise test was "easily negative," though Plaintiff exhibited tenderness with the right hip and "the right lumbosacral paraspinal musculature." (*Id.* at 83) Dr. Cantrell indicated he would prescribe Naprosyn, Nortriptyline, and Tramadol to Plaintiff. (*Id.* at 84)

In February 2014, Plaintiff told Dr. Cantrell that he was "having good results with a change of [physical] therapy," and his pain was "reduced down to a 5/10." (Doc. 7-10 at 100) Plaintiff reported he took Naprosyn twice daily; Nortriptyline nightly; and Tramadol four times daily, on the day of therapy and the day after. (*Id.*) Dr. Cantrell observed that Plaintiff's "right-sided limp [was] slight but... accentuated by heel walking and toe walking." (*Id.*) He found Plaintiff's hip was "mildly tender," and "internal and external rotation produced a complaint of minor discomfort but not severe pain." (*Id.*) Dr. Cantrell opined Plaintiff was "doing much better." (*Id.*)

Plaintiff told Dr. Mayo that he felt "some improvement" with physical therapy in March and April 2014, but he continued to report pain from his right hip down to foot. (Doc. 7-10 at 47, 48) On April 7, Plaintiff reported he could "walk on his heels and toes quite well," though Dr. Cantrell observed that heel walking accentuated Plaintiff's limp. (*Id.* at 98) Plaintiff said he reduced his intake

of Tramadol "to approximately four tables per week." (*Id.*) Plaintiff requested an extension of physical therapy, which Dr. Cantrell granted. (*Id.*) On April 14, Dr. Mayo indicated he could "no longer do anything to help" Plaintiff. (*Id.* at 47) Although Dr. Mayo did not schedule Plaintiff's next visit, he also noted Plaintiff was not discharged from his care. (*Id.*)

Dr. Cantrell examined Plaintiff on May 20, 2014 and found he "continue[d] to have adequate strength to walk on his heels and toes," and "[h]is reflexes [were] normal." (Doc. 7-10 at 97) Plaintiff continued to walk with a right-sided limp. (*Id.*) Dr. Cantrell indicated that he reviewed Plaintiff's job description for work as a carpenter and opined "it [was] clearly beyond his work capabilities." (*Id.*) According to Dr. Cantrell, Plaintiff was "not able to use his right lower limb to repetitively step with his right foot on an accelerator and/or break." (*Id.*) He opined Plaintiff could "[]not work at heights" and could "[]not lift more than 15 to 20 pounds at a time." (*Id.* at 97)

Dr. Richard Baker performed an Agreed Medical Examination on May 19, 2014. (Doc. 7-12 at 70) Plaintiff said he his low back pain was 5/10 on average, but the date of the examination was 9/10, which he said was "largely due to the drive for [the] examination." (*Id.* at 73) Dr. Baker determined Plaintiff had "diminished" pinprick sensation over his right thigh and exhibited "mild diffuse weakness of the right lower extremity, 4+/5 generally, but particular weakness of right ankle plantar flexion, 3+/4+." (*Id.* at 76) Plaintiff had a positive straight leg raise test with hip pain on the right at 60 degrees. (*Id.*) Dr. Baker concluded Plaintiff should "be precluded from lifting more than 40 to 50 pounds, excessive bending/stooping, weightbearing more than 75% of the time, any more than occasional climbing, and any more than occasional squatting/kneeling, and any more than occasional walking on uneven ground." (*Id.* at 79) Dr. Baker opined: "Assuming the accuracy of Mr. Smith's job description, he is not able to resume usual and customary [duties], but is able to resume modified or alternate work with restrictions." (*Id.* at 80)

In July 2014, Plaintiff told Dr. Cantrell that he continued to have right hip pain, but he was "doing better" and "[h]is pain level [was] reduced." (Doc. 7-10 at 94) Dr. Cantrell observed that Plaintiff had a limp while walking on his toes but not with heel walking, and his straight leg raise test was negative. (*Id.*)

The following month, Dr. Cantrell observed Plaintiff continued to have a limp and could

"perform heel walking and toe walking," though it was "somewhat unsteadily done." (Doc. 7-10 at 92)

In September 2014, Plaintiff told Dr. Cantrell that he was "taking the tramadol but [found] it not to be of great benefit," and he anticipated discontinuing the medication. (Doc. 7-10 at 90) Dr. Cantrell also noted Plaintiff could "heel and toe stand but walk[ed] with a marked right-sided limp if he attempt[ed] to walk on his heels or toes." (*Id.* at 91) Dr. Cantrell "recommended that [Plaintiff] start walking up and down small sets of steps," and continue with his football "'coaching duties' despite his limitations," because Plaintiff enjoyed watching his son play though he could not run or walk with his son. (*Id.*)

Dr. Charles Lee reviewed available records and completed a physical residual functional capacity assessment regarding Plaintiff's current level of functioning on November 6, 2014. (Doc. 7-6 at 8-10) Dr. Lee determined Plaintiff could lift and carry 25 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of two hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 8) He opined Plaintiff was limited to occasional pushing and pulling, including the operation of foot controls, with his right leg. (*Id.*) In addition, Dr. Lee found Plaintiff could frequently balance and occasionally climb, kneel, crouch, and crawl. (*Id.* at 8-9) He indicated Plaintiff did not have any manipulative limitations, but he should avoid concentrated exposure to vibration and hazards such as machinery and heights. (*Id.* at 9)

Plaintiff described chest tenderness in December 2014, which was attributed to Nortriptyline. (Doc. 7-10 at 86) Plaintiff told Dr. Cantrell he stopped taking it, after which he developed "extreme difficulty in sleeping." (*Id.*) Dr. Cantrell directed Plaintiff to resume taking Nortriptyline. (*Id.* at 87)

Dr. Pauline Bonilla completed a comprehensive psychiatric evaluation on December 27, 2014. (Doc. 7-11 at 4) Plaintiff stated his "depressive symptoms started around 2011 shortly after his injury," and reported an "increase in stress and being unable to work as well as remain independent." (*Id.* at 5) He also said he felt depressed, which he attributed "to medical issues, chronic pain, and physical limitations." (*Id.*) Dr. Bonilla observed that Plaintiff's "behavior was cooperative" and his thought content was appropriate. (*Id.* at 6) She found Plaintiff "was able to recall 4/4 digits forward and 3/4 digits backwards" and "able to recall 3/3 objects after five minutes." (*Id.*) Plaintiff "was able to perform a simple three-step command successfully," and Dr. Bonilla opined his "concentration was

within normal limits." (*Id.*) Dr. Bonilla diagnosed Plaintiff with "Depressive disorder, NOS, secondary to a medical condition." (*Id.* at 7) She opined Plaintiff was "mildly impaired" with his ability to perform simple and repetitive tasks, accept instructions from supervisors, interact with coworkers and the public, sustain an ordinary routine without special supervision, and maintain regular attendance. (*Id.* at 8) In addition, Dr. Bonilla determined he was "mildly to moderately impaired" with the "ability to perform detailed and complex tasks" and "deal with stress and changes encountered in the workplace." (*Id.*)

Dr. Sandip Sen reviewed available records and completed a psychiatric review technique and mental residual functional capacity assessment on January 11, 2015. (Doc. 7-6 at 6-7. 10-12) Dr. Sen opined Plaintiff had mild limitations with activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties with maintaining concentration, persistence, or pace. (*Id.* at 6) According to Dr. Sen, Plaintiff had a "sufficient ability to complete simple repetitive tasks, to follow directions without additional assistance once a task is learned, and to maintain adequate attention, concentration, persistence and pace as needed to complete simple tasks." (*Id.* at 11) Dr. Sen also opined Plaintiff could "make practical decisions, manage minor workplace stress [and]... adapt to a low stress work setting. (*Id.*)

In February 2015, Plaintiff told Dr. Cantrell that he was "having much more pain" in his right hip, groin, and more. (Doc. 7-11 at 17) Dr. Cantrell again observed that Plaintiff walked "with a decided right-sided limp." (*Id.*) He suggested Plaintiff "may wish to change primary treating physicians," because he did not have any further suggestions for treatment. (*Id.*) Dr. Cantrell opined Plaintiff was "disabled at the present... [and] it [was] not likely that he [was] going to be able to reduce his pain to the point that he [was] about to return to gainful employment." (*Id.* at 18)

Drs. Paul Klein and Roger Fast reviewed Plaintiff's records related to his request for reconsideration. (Doc. 7-6 at 20) Dr. Klein found "no new evidence [was] received to change the initial decision" and adopted the mental residual functional capacity assessment of Dr. Sen. (*Id.*) Dr. Fast noted that Plaintiff was walking with a limp and exhibited tenderness in the right hip and groin. (*Id.*) He affirmed the sedentary residual functional capacity with postural and environmental limitations identified by Dr. Lee. (*Id.* at 20, 22-23)

On April 27, 2015, Plaintiff returned to Dr. Mayo, reporting "a lot of numbness, tingling and burning type sensations from his sciatic nerve all the way down his right lower extremities and [Plaintiff said] there is no way he can perform his normal job duties." (Doc. 7-11 at 71) He also described "paresthesias shooting down his right leg." (*Id.*, emphasis omitted) Plaintiff told Dr. Mayo that he had an attorney and believed he was "going to be medically retired." (*Id.*) Dr. Mayo found Plaintiff had a positive straight leg raise test, and he exhibited pain from the right hip down to the right foot. (*Id.*)

Dr. Mayo completed a medical source statement on April 30, 2015. (Doc. 7-11 at 37-40) He noted Plaintiff had been diagnosed with sciatica, neuritis, pain in [his] limb, and meralgia paresthetica; and his symptoms included chronic pain, leg weakness, instability and fatigue. (*Id.* at 37) Dr. Mayo believed Plaintiff's "current job duties, lifting, walking, running [and] carrying all aggravate" his pain. (*Id.*, emphasis omitted) He indicated the "clinical findings and objective signs" included "parasthesias [with] weakness" in his right leg, the straight leg raise test, and antalgic gait. (*Id.*) According to Dr. Mayo, Plaintiff could walk less than one city block without rest or severe pain, sit for thirty minutes at one time and less than two hours in an eight-hour day, and stand for 10-15 minutes at one time and less than two hours in an eight-hour day. (*Id.* at 38) Dr. Mayo opined Plaintiff could never lift and carry 10 pounds or more and could never twist, stoop, crouch, or climb. (*Id.* at 39) He indicated Plaintiff was limited to using his hands for grasping, turning, twisting, performing fine manipulation, or reaching in front of his body for only 50% of a workday; and he could never reach over head. (*Id.*) Dr. Mayo opined that Plaintiff could not tolerate low-stress work "due to physical limitations," but did not identify the reason for this conclusion (*Id.* at 40) Where the questionnaire asked Dr. Mayo to identify "any other limitations ... that would affect your patient's ability to work at a regular job on a sustained basis," Dr. Mayo wrote: "cannot perform duties." (*Id.*)

In May 2015, Dr. Cantrell opined Plaintiff was "doing reasonably well, [though] his right foot … started to swell." (Doc. 7-11 at 53) Plaintiff told Dr. Cantrell that he had "bumped his dose of tramadol up to three times daily, where it was prescribed for …twice daily." (*Id.*) Dr. Cantrell observed that Plaintiff continued to walk with a limp, and "[h]is right hip [was] mildly tender." (*Id.*) He refilled Plaintiff's medications and indicated Plaintiff should return in four months. (*Id.*)

In June 2015, Plaintiff continued to describe "numbness, tingling and burning sensations" to Dr. Mayo, when he was fitted for new orthotics. (Doc. 7-11 at 70) Dr. Mayo noted Plaintiff's "previously symptomatic regions [were] still tender to the touch or full weight-bearing and range of motion." (*Id.*)

Plaintiff told Dr. Mayo he recently felt "a lot of pain," and his leg "was almost [too] weak for him to even stand on it" in August 2015. (Doc. 7-11 at 68) Dr. Mayo determined Plaintiff exhibited weakness in most muscle groups of his right leg and instability in the right leg with prolonged ambulation in the office. (*Id.*) Dr. Mayo "recommended continued use of the orthotic appliances on an indefinite basis since he [had] achieved a mild reduction in his symptomology over the relatively short time of their use." (*Id.*)

At the next follow-up with Dr. Cantrell in September 2015, Plaintiff said he was seeing a trainer and "exercising twice a week," and he was taking Naprosyn twice daily and tramadol "twice daily as needed" (Doc. 7-11 at 51) Plaintiff exhibited a "slight right heel drop when he [did] heel walking and toe walking," and Dr. Cantrell determined Plaintiff's "right gastrocnemius [was] of reduced bulk." (*Id.*)

In March 2016, Plaintiff told Dr. Cantrell that he was "attending a gym two to three times a week and stretch[ed] and [did] light weights." (Doc. 7-11 at 49) He said he took "one to two 50 mg tables of tramadol per day for pain and Naprosyn 500 mg twice daily." (*Id.*) Dr. Cantrell noted Plaintiff had "a slight right heel drop" and was walking with inserts. (*Id.*) Dr. Cantrell indicated he would see Plaintiff in six months unless he had a flare up. (*Id.*) A few weeks later, Plaintiff returned, reporting he "was starting to do a more vigorous exercise program when he had a flare-up of his pain," including "pain radiating from his right low back, to his right hip, to his right groin and down his posterior thigh and leg." (*Id.* at 47) Dr. Cantrell observed that Plaintiff walked "with a markedly antalgic gait," and "his right hip [was] approximately one and one-half inches higher than his left." (*Id.*) Dr. Cantrell determined Plaintiff had a positive straight leg raise and the rotation of his right leg caused pain, but "[i]ndividual muscle testing show[ed] no weakness." (*Id.* at 48) He prescribed Flexeril for Plaintiff and referred him to a course of physical therapy. (*Id.*)

In May 2016, Plaintiff returned to Dr. Cantrell, reporting that his "hip and low back [felt] somewhat better" after six sessions of physical therapy, and he stopped taking Flexeril. (Doc. 7-11 at 45) Dr. Cantrell observed that Plaintiff continued to walk with a limp but was able to "heel walk and

toe walk." (*Id.*) Plaintiff's physical therapist requested another nine sessions, and Dr. Cantrell wrote a prescription for eight. (*Id.*) Because the physical therapist was "extremely busy," Plaintiff was unable to begin the additional sessions until July 2016. (*Id.* at 41)

On July 12, 2016, Plaintiff returned to Dr. Mayo, who noted Plaintiff had "not been seen for quite some time." (Doc. 7-11 at 66) Plaintiff stated he was "still having weakness in his right lower extremity and [got] burning, numbness and tingling in his right foot and hip." (*Id.*) He also stated it "felt as if the bottom of his right foot [was] on fire," and "his right great toe [was] locking up on him at the joint." (*Id.*) Plaintiff also said his left leg was bothering him "from compensation." (*Id.*) Plaintiff reported he was "currently taking Naprosyn and [was] no longer taking Tramadol," though "he felt the Tramadol worked better for pain." (*Id.*) Dr. Mayo found Plaintiff had "some mild paresthesias to his right foot with a positive right straight leg raise test." (*Id.*) Plaintiff also had "less than 20º dorsiflexion and plantarflexion of the right great toe," and x-rays showed arthritic changes with joint space narrowing. (*Id.*) Dr. Mayo administered an injection, which Plaintiff reported helped his toe. (*Id.* at 64, 66)

Dr. Mayo also completed a second physical medical source statement on July 12, 2016. (Doc. 7-11 at 60-63) He indicated Plaintiff's symptoms included chronic pain, burning, numbness, tingling, and weakness of the right lower extremity. (*Id.* at 60) He noted the clinical findings related to Plaintiff's impairments included pain with a straight leg raise test and pain to palpation. (*Id.*) Dr. Mayo opined Plaintiff also suffered from depression, anxiety, and stress/frustration, which affected his physical condition. (*Id.*) He believed Plaintiff could walk one to two city blocks without rest or severe pain, sit for thirty minutes at one time or less than two hours total in an eight-hour day, and stand for thirty minutes at one time or less than two hours total. (*Id.*) Dr. Mayo opined Plaintiff could never lift and carry ten pounds or more, perform postural activities, or reach overhead. (*Id.* at 61-62) He indicated Plaintiff could use his hands and arms for grasping, turning, fine manipulation, and reaching in front of his body for 50% of a workday. (*Id.* at 62) According to Dr. Mayo, Plaintiff was likely to be off task 25% or more of a workday due to the severity of his symptoms interfering with attention and concentration, and again indicated Plaintiff was incapable of even low stress work "due to physical limitations." (*Id.*) Dr. Mayo did not complete the section of the form requesting the reason for this

conclusion.  (*Id.*)  Where the questionnaire asked Dr. Mayo to identify "any other limitations ... that would affect your patient's ability to work at a regular job on a sustained basis," Dr. Mayo again wrote: "cannot perform duties."  (*Id.* at 63)

**B.      Administrative Hearing Testimony**

Vocational expert Robin Generaux testified at the hearing on February 1, 2017.  (Doc. 7-5 at 48)  She identified Plaintiff's past relevant work under the *Dictionary of Occupational Titles*[3] as a carpenter, *DOT* 860.381-022, which required a medium physical exertion.  (*Id.*)

The ALJ asked the VE to consider "a hypothetical individual of the claimant's age, education and with the past job that [she] had described."  (Doc. 7-5 at 50)  In addition, the ALJ stated:

> [F]urther assume that this individual is limited to lifting and carrying 25 pounds occasionally and ten pounds frequently, standing and/or walking for two hours out of an eight hour day, sitting for six out of an eight hour day with only occasional foot controls with the right foot, occasionally climbing stooping, kneeling, crouching, and crawling but frequently balancing, with only occasional exposure to vibrations, moving machinery and heights.
>         Additionally can perform simple, routine tasks, make simple work related decisions and can respond appropriately to changes in a routine work setting.

(*Id.*)  The VE opined the hypothetical individual with these limitations could not perform Plaintiff's past work.  (*Id.*)  However, the worker could perform sedentary work in the national economy.  (*Id.*)  As examples, the VE identified the following positions: addresser, DOT 209.587-010; document preparation clerk, DOT 249.587-018; and surveillance system monitor, DOT 379.367-010.  (*Id.* at 50-51)  The VE opined a person with the additional limitation "of no forceful gripping or grasping with the right hand" could also perform these positions.  (*Id.* at 51)

Plaintiff's counsel asked the VE to consider the same individual, whose "handling, fingering, [and] grasping would be limited to occasional."  (Doc. 7-5 at 53)  The VE testified an individual with these limitations could not perform Plaintiff's past relevant work, but he could perform the system surveillance monitor position.  (*Id.* at 53-54)

**C.      The ALJ's Findings**

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

Pursuant to the five-step process, the ALJ determined Plaintiff "ha[d] not engaged in substantial gainful activity since June 4, 2013, the alleged onset date." (Doc. 7-3 at 22) Second, the ALJ found Plaintiff's severe impairments included "depression and status-post right Achilles tendon repair." (*Id.*) At step three, the ALJ found these impairments did not meet or medically equal a listed impairment. (*Id.* at 22-24) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and carry 25 pounds occasionally, 10 pounds frequently, stand and walk 2 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. He is capable of occasionally climbing, stooping, kneeling, crouching and crawling, and frequently balancing. The claimant is limited to occasional use of his right foot to operate foot controls. He is able to occasionally be exposed to vibrations, moving machinery and heights. The claimant can perform simple, routine tasks, make simple work-related decisions, and respond appropriately to changes in a routine work setting.

(*Id.* at 24) Considering this residual functional capacity, as well as Plaintiff's "age, education, [and] work experience," the ALJ determined there were "jobs that exist in significant numbers in the national economy that the claimant [could] perform," including addresser, document prep clerk, and surveillance systems monitor. (*Id.* at 30-31) Therefore, the ALJ concluded Plaintiff was "not under a disability, as defined in the Social Security Act, from June 4, 2013, through the date of [the] decision." (*Id.* at 31)

## DISCUSSION AND ANALYSIS

Plaintiff argues "the ALJ erred in disregarding the opinion of [his] treating physician, Dr. Mayo." (Doc. 14 at 30, emphasis omitted) Plaintiff also asserts "[t]he ALJ erred by failing to consider the impact of [his] borderline age category." (*Id.* at 35, emphasis omitted)

**A.     The ALJ's Evaluation of the Medical Record**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Here, Plaintiff contends the ALJ erred in evaluating the opinions of Dr. Mayo, a treating physician. Because the limitations Dr. Mayo assessed were contradicted by other physicians— including Drs. Baker, Lee and Fast— the ALJ was required to identify specific and legitimate reasons for rejecting Dr. Mayo's opinions.

The ALJ indicated she gave "[l]ittle weight" to the opinions of Dr. Mayo concerning Plaintiff's physical residual functional capacity. (Doc. 7-3 at 27) The ALJ noted:

> In April 2015, Podiatrist Paul Mayo completed a Physical Medical Source Statement for the claimant. Dr. Mayo diagnosed him with sciatica; neuritis; pain in limb; and neuralgia paresthetica, with a fair to poor diagnosis. Symptoms included chronic pain, lower extremity weakness, instability and fatigue. He opined the claimant was unable to lift and carry any amount of weight, could stand for 15-20 minutes at a time, for a total of less than 2-hours in an 8-hour workday, walk less than one block, for less than 2-hours in an 8-hour workday, and sit for 30 minutes at a time, for a total of less than 2-hours in an 8-hour workday. He was precluded from twisting, stooping, crouching, or climbing stairs or ladders. The claimant was limited to grasping, turning or twisting objects with his bilateral hands; engaging in fine manipulation with his bilateral fingers, or reaching in front of his body with his bilateral arms 50% of the workday. He was unable to reach overhead. The claimant would likely be off task 25% or more of the workday, due to symptoms interfering with the attention and concentration necessary to perform even simple work tasks. He was incapable of performing even low stress work. The doctor stated the claimant was unable to perform his duties (Exhibit 10F). Another form was completed in July 2016, which, with only minor changes, had identical limitations (Exhibit 12F).
>
> Little weight is given to this opinion, much of which is inconsistent with the record. The Dr. Mayo gave manipulative limitations, when there are no corresponding medical

16

findings supporting those limitations. It appears his opinion is based on the claimant's reports, rather than the examinations.  A podiatrist treats foot, ankle and related leg problems, yet Dr. Mayo addressed limitations outside the area of his expertise including mental limitations. Nonetheless, his opinion regarding the claimant's lower extremities restrictions have been considered in this opinion.

(Doc. 7-3 at 25-26)

### 1.     Specialty of Dr. Mayo and the treatment relationship

Plaintiff contends the ALJ erred in rejecting the limitations identified by Dr. Mayo because she "did not indicate she considered such probative factors as Dr. Mayo's five-year treating relationship with Mr. Smith, Dr. Mayo's specialization of podiatry and its relevance to Plaintiff's associated worsening compensating impairments, and the consistency of Dr. Mayo's diagnoses with that of Dr. Cantrell, Dr. Baker, Dr. Bhatia (AR 385, 622) when determining the weight to afford Dr. Mayo's opinion."  (Doc. 14 at 33)  In response, the Commissioner asserts that "the ALJ complied with the applicable Social Security regulations and properly considered the relevant factors enumerated in section 404.1527(c) when evaluating Dr. Mayo's opinion," including the treatment relationship, supportability, treatment, and the specialty of Dr. Mayo.  (Doc. 15 at 8; *see also id.* at 5-8)

#### a.     Length of treatment relationship

Contrary to Plaintiff's assertions, in reviewing the medical record, the ALJ observed: "Podiatrist Paul Mayo, D.P.M., treated the claimant between September 2011 and September 2016 (Exhibits 3F, 10F, 12F, 16F, 18F, 19F)."  (Doc. 7-3 at 24) The ALJ also noted the treatment relationship began when Plaintiff "was seen by Dr. Mayo for an injury to [his] right Achilles tendon," and "[t]he doctor performed an open repair... with graft jacket application."  (*Id.*)  Thus, the ALJ clearly considered the length of the treatment relationship in her opinion.

#### b.     Diagnoses of Plaintiff's impairments

Plaintiff asserts the ALJ also failed to consider the consistency of Plaintiff's diagnoses by Dr. Mayo with the diagnoses of other physicians.  In reviewing the medical record, the ALJ noted Dr. Mayo "diagnosed him with sciatica; neuritis; pain in limb; and neuralgia paresthetica."  (Doc. 7-3 at 26) The ALJ also noted Dr. Bhatia diagnosed Plaintiff with "right side sacroiliitis, by favoring his left leg and not using his right leg very well" and "piriformis syndrome." (*Id.* at 25) Likewise, the ALJ observed that Dr. Cantrell diagnosed Plaintiff with "right meralgia paresthetica," pain, and "greater

trochanteric bursitis" and Dr. Baker opined Plaintiff had "secondary right hip greater trochanteric bursitis; and secondary low back pain syndrome." (*Id.* at 26) Thus, contrary to Plaintiff's assertions, the ALJ clearly considered the diagnoses of the various physicians in evaluating the opinions in the medical record, including those of Dr. Mayo.

### c.     Specialty of Dr. Mayo

In support of the decision to give "little weight" to the limitations identified by Dr. Mayo, the ALJ noted that Dr. Mayo opined on limitations "outside the area of his expertise" as a podiatrist. (Doc. 7-3 at 27) Under the Regulations, a physician's specialization is a factor the ALJ is directed to consider "in deciding the weight [to] give to any medical opinion." 20 C.F.R. § 404.1527(c). Specifically, the Regulations indicate: "We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." *Id.*, §§ 404.1527(c)(5), 416.927(c)(5); *see also Turley v. Sullivan,* 939 F.2d 524, 527 (8th Cir. 1991) (an ALJ need not give controlling weight to a physician's opinions on matters outside his expertise). Thus, the ALJ was entitled to give less weight to the opinions of Dr. Mayo, who is a podiatrist yet offered opinions on Plaintiff's mental limitations and manipulative limitations.

### d.     Lack of clinical findings and objective signs

The ALJ observed that Dr. Mayo "gave manipulative limitations, when there are no corresponding medical findings supporting those limitations." (Doc. 7-3 at 27) Significantly, as the ALJ observed, Dr. Mayo did not identify any clinical findings or objective evidence to support these limitations in the questionnaires completed. (*See* Doc. 7-11 at 37-40, 60-63) Although Plaintiff now argues the positive straight leg raise tests support the manipulative limitations because "lower back pain... often results in associated pain with reaching and grasping" (Doc. 14 at 33), Dr. Mayo did not report that Plaintiff's back pain was the reason for the limitations identified—including twisting his hands, turning his hands, or fine manipulation— and, indeed, only identified clinical findings in the portion of the questionnaire following Plaintiff's diagnoses and symptoms. The Court cannot speculate, as Plaintiff would have it, as to the bases of Dr. Mayo's opinions. Indeed, Dr. Mayo also did not complete the portion of the form that specifically asked him to identify the reasons for his conclusions related to Plaintiff's mental limitations. (*See* Doc. 7-11 at 40, 62)

Significantly, the opinion of a physician may be rejected when it is "conclusory and brief" and lacks the support of clinical findings. *Magallanes*, 881 F.2d at 751; *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (a physician's opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion). Consequently, the Ninth Circuit determined that an ALJ may reject or give less weight to a treating physician's opinion that is in the form of a checklist, and where the opinion is brief and lacks supportive objective evidence. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ permissibly rejected . . . reports that did not contain any explanation of the bases of their conclusion"); *Batson v Comm'r of Soc. Security*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("treating physicians' views carried only minimal evidentiary weight" when the physician fails to identify supportive objective evidence). Because Dr. Mayo failed to explain the bases for the limitations identified, the ALJ did not err in giving less weight to his opinions.

        *e.*      *Opinions based on Plaintiff's subjective reports*

The ALJ observed that it appeared Dr. Mayo's opinions were "based on the claimant's reports, rather than the examinations." (Doc. 7-3 at 27) Notably, this reason was not specifically addressed or challenged by Plaintiff, who also did not challenge the adverse credibility determination.[4]

The Ninth Circuit determined that a physician's opinion may be rejected when it is predicated upon a claimant's subjective complaints that have been properly rejected by the ALJ. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). The Court explained an opinion "premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded, once those complaints themselves have been properly discounted." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1463-64 (9th Cir. 1995)); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (an ALJ may discount a treating physician opinion that is based on a claimant's "subjective characterization of her symptoms," which the ALJ found not entirely credible). Because the ALJ found Plaintiff's subjective complaints lacked credibility, her determination that Dr. Mayo's opinion was based upon Plaintiff's

---

[4] Because Plaintiff did not challenge this reason identified by the ALJ for giving less weight to the opinions of Dr. Mayo, he waived any argument related thereto. *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("arguments not raised by a party in an opening brief are waived"); *see also Pendley v. Colvin*, 2016 U.S. Dist. LEXIS 53470 at *22-23 (Dist. Or. Mar. 2, 2016) (noting that the plaintiff "challenge[d] some, but not all, of the reasons provided by the ALJ" and "any argument against those non-challenged reasons [was] deemed waived")

reports supports the decision to give less weight to the limitations identified by Dr. Mayo.[5]

### 2. Substantial evidence supports the ALJ's determination

When an ALJ rejects the opinion of a physician, the ALJ must not only identify a specific and legitimate reason for rejecting the opinion, but the decision must also be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. Accordingly, because the ALJ articulated specific and legitimate reasons for rejecting the opinions of Dr. Mayo, the decision must be supported by substantial evidence in the record.

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[6]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ gave "some weight" to the opinion of Dr. Baker, who examined Plaintiff in May 2014. (Doc. 7-3 at 26) Although the ALJ gave additional postural limitations than those identified by Dr. Baker—including the limitation to occasional stooping, crawling—and greater lifting requirements, it is also clear that the RFC identified by the ALJ is supported by the conclusion of Dr. Baker, who believed Plaintiff could lift and carry up to 40 pounds. (*See* Doc. 7-12 at 79) In addition, Dr. Baker opined Plaintiff "should be precluded from ... weightbearing more than 75% of the time," and the ALJ concluded Plaintiff could stand and walk for two hours in an eight-hour day, which amounts to 75% of the workday. (Doc. 7-3 at 24) The opinions of Dr. Baker constitute substantial evidence, because they "rest[] on independent examination." *Tonapetyan*, 242 F.3d at 1149; *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such

---

[5] For example, in April 2015, Plaintiff returned to Dr. Mayo after nearly a year, and reported he "he had "a lot of numbness, tingling and burning type sensations from his sciatic nerve all the way down his right lower extremities and [Plaintiff said] there is no way he can perform his normal job duties." (Doc. 7-11 at 71) Days later, Dr. Mayo completed a medical source statement in which he concluded Plaintiff "cannot perform duties." (*Id.* at 40)

[6] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

findings are substantial evidence).

Further, Drs. Lee and Fast—to whom the ALJ attributed "great weight"— opined Plaintiff could lift and carry 25 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of two hours in an eight-hour day, sit about six hours in an eight-hour day, and occasionally perform postural activities, be exposed to hazards, and operate foot controls. (Doc. 7-6 at 8-10, 20, 22-23) These findings are consistent with the limitations imposed by Dr. Baker. As a result, the opinions of Drs. Lee and Fast are also substantial evidence in support of the ALJ's decision. *See Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when ... consistent with other independent evidence in the record").

## C.    Plaintiff's Age Category

Plaintiff's contends the ALJ also failed "to consider the impact of Plaintiff's borderline age category" at step five of the sequential evaluation. (Doc. 14 at 35)  Plaintiff observes that the ALJ was "not *required* to use an older age category, but the ALJ must consider whether to do so." (*Id.* at 36, emphasis in original) (citing *Lockwood v. Comm'r Social Sec. Admin.*, 616 F.3d 1068, 1070 (9th Cir. 2010))  According to Plaintiff:

> Having made the finding that Mr. Smith is limited to sedentary work, the ALJ would have been required to conclude that Plaintiff was disabled if the ALJ had treated Mr. Smith as a person within the "closely approaching advanced age" category. *See*, Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, Table 1. However, there is no indication that the ALJ considered Mr. Smith's borderline age and its impact.

(*Id.*)  In response, the Commissioner contends " Plaintiff has not put forward any argument as to why he should have been considered as prematurely of closely approaching advanced age," and the ALJ did not err in her step five analysis. (Doc. 15 at 11)

### 1.    Step Five

At step five, the burden shifts to the Commissioner to show that Plaintiff can perform other substantial gainful activity and a "significant number of jobs exist in the national economy" that Plaintiff can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1162(9th Cir. 2001) (discussing the burden shift at step five). The Commissioner can carry this burden two ways: "(a) by the testimony of a vocational expert, or (b) by reference to the

Grids.[7]" *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999); *see also Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010).

    2.    ALJ's consideration of Plaintiff's age

    The Grids are tables of the "four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983). For purposes of applying the Grids, there are three age categories: younger persona (under age 50), persona closely approaching advanced age (age 50-54), and persona of advanced age (age 55 or older). 20 C.F.R. § 416.963(c)-(e). In addition, the Regulations provided in relevant part:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

*Id.*, § 416.963(b); *see also* POMS DI 25015.006 at B ("We do not have a more precise programmatic definition for the phrase 'within a few days to a few months.' The term 'a few' is defined using its ordinary meaning, a small number. Usually, we consider a few days to a few months to mean a period not to exceed 6 months.'"). In a "borderline situation," "an ALJ is not *required* to use an older age category, even if the claimant is within a few days or a few months of reaching an older age category." *Lockwood*, 616 F.3d at 1071 (emphasis in original); *citing Bowie v. Comm'r*, 539 F.3d 395, 399-401 (6th Cir. 2008) (holding that section 404.1563(b) "does not impose on ALJs a *per se* procedural requirement to address borderline age categorization in every borderline case"). Rather, the ALJ is required by the Regulations only to consider whether to use an older age category. *Id.* at 1071.

    In *Lockwood*, the claimant argued that the ALJ failed to consider, pursuant to § 404.1563(b), whether she should be placed in an older age category for purposes of the disability decision. *Lockwood*, 616 F.3d at 1071-72. The Ninth Circuit determined that the ALJ satisfactorily considered whether to use an older age category where the ALJ "mentioned in her decision Lockwood's date of

---

    [7] The Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2, are commonly known as "the grids". *See, e.g., Bragdon v. Astrue*, 2010 U.S. Dist. LEXIS 31086, at *22 (E.D. Cal. Mar. 31, 2010).

birth and found that Lockwood was 54 years old, and thus a person closely approaching advance age on the date of the ALJ's decision." *Id.* at 1072. The Court reasoned that the ALJ was "[c]learly... aware that Lockwood was just shy of her 55th birthday, at which point she would become a person of advanced age." *Id.* In addition, the Court noted the ALJ "cited to 20 C.F.R. § 404.1563, which prohibited her from applying the age categories mechanically in a borderline situation." *Id.* The Ninth Circuit concluded that these facts were sufficient to show "the ALJ knew she had discretion 'to use the older age category after evaluating the overall impact of all the factors of [Lockwood's] case.'" *Id.*, citing 20 C.F.R. § 404.1563(b). Further, the Court opined the "ALJ did not 'apply the age categories mechanically' because the ALJ 'evaluat[ed] the overall impact of all the factors of [Lockwood's] case' when the ALJ relied on the testimony of a vocational expert before she found Lockwood was not disabled." *Id.*

Similarly, here, the ALJ stated in her decision that Plaintiff "was born on August 26, 1967 and was 45 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date," and cited to 20 C.F.R. § 404.1563. (Doc. 7-3 at 30) Although Plaintiff argues that *Lockwood* the matter before the Court is not similar to *Lockwood* because the ALJ referred to his age at the time he filed the application rather that the date of the decision (Doc. 14 at 36), it is implausible to suggest that the ALJ was unaware of Plaintiff's current age at the time of her decision—or that she did not consider his age— where she referenced his birthdate, his age at the application date, and had previously identified the application date of September 4, 2014,in her decision. (*See* Doc. 7-3 at 20, 30) Further, as in *Lockwood*, the ALJ clearly cited the Regulations mandating that she "not apply the age categories mechanically in a borderline situation," and defining the age categories. The ALJ also relied upon the testimony of a vocational expert, who she asked to consider "a hypothetical individual *of the claimant's age*, education and with the past job that [she] had described." (Doc. 7-5 at 50, emphasis added).

Accordingly, the Court finds the ALJ did not commit reversible error at Step Five by failing to explain in her decision why she used Plaintiff's chronological age rather than applying the higher age category under the Grids. *See Lockwood*, 616 F.3d at 1074; *see also Flash v. Colvin*, 2016 WL 1086886, at *6 (E.D. Cal. Mar. 21, 2016) (ALJ sufficiently considered claimant's borderline age under *Lockwood* where "the ALJ noted Plaintiff's date of birth, her age *at the alleged disability onset date*,

and her age category *at the time of the decision*, citing the Regulatoins, and relying on the testimony of a vocational expert); *Perez v. Astrue*, 2012 WL 28639, at *6 (E.D. Cal. Jan. 5, 2012) ("The ALJ properly set forth Plaintiff's birth date in his decision, cited and acknowledged § 404.1563, and relied on the testimony of a VE indicating that the ALJ did not mechanically apply the age categories. This was sufficient consideration of Plaintiff's borderline age pursuant to § 404.1563 and the Ninth Circuit's holding in Lockwood").

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ applied the proper legal standards and the decision is supported by substantial evidence in the record. Thus, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act through the date of the ALJ's decision. *Sanchez*, 812 F.2d at 510; *Matney*, 981 F.2d at 1019. Accordingly, the Court **ORDERS**:

1.　　The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.　　The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, Andrew M. Saul, Commissioner of Social Security, and against Plaintiff Shawn Hall Smith.

IT IS SO ORDERED.

Dated:　**August 19, 2019**　　　　　**/s/ Jennifer L. Thurston**
　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE